# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARBARA GILLIS; THOMAS GILLIS; SCOTT MCCLELLAND; KIMBERLY MCCLELLAND; INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | CIVIL ACTION<br><br>No. 14-3856 |
| *Plaintiffs*, | |
| v. | |
| RESPOND POWER, LLC, | |
| *Defendant*. | |

**Goldberg, J.**                                                                                          **July 16, 2018**

## MEMORANDUM OPINION

In this putative class action, Plaintiffs are consumers who purchased electricity from Defendant, Respond Power LLC, under a variable rate agreement. Plaintiffs allege that, in order to induce them to switch from their local utility company, Defendant misrepresented the rates that it would charge. Plaintiffs further allege that Defendant breached the variable rate agreement by charging them a higher rate for electricity than their local utility company would have charged them during the same time period.

Defendant has moved to dismiss for failure to state a claim regarding both of Plaintiffs' two class claims—one for breach of contract and the implied covenant of good faith and fair dealing, and the other for a declaratory judgment regarding the variable rate agreement's meaning. For the reasons that follow, Defendant's Motion will be granted and Plaintiffs' class claims will be dismissed.

I.   **FACTUAL & PROCEDURAL BACKGROUND**

   A.   *Factual Background*

The following facts are derived from Plaintiffs' First Amended Class Action Complaint and the exhibits attached thereto.[1]

In Pennsylvania's deregulated marketplace for electricity, consumers have the option of purchasing their electricity from the local utility company that services their location, such as PECO or Penelec, or from an "Electric Generation Supplier," such as Defendant. While the local utility companies may only sell electricity at fixed rates approved by the Pennsylvania Public Utility Commission, Electric Generation Suppliers may sell to consumers under fixed or variable rate contracts, without the Commission's approval or oversight. (1st Am. Class Action Compl. ¶¶ 6, 16, 17.)

Named Plaintiffs are four Pennsylvania consumers who switched their electric service to Defendant from their local utility company in 2013, after being solicited by a door-to-door salesperson. Named Plaintiffs Barbara and Thomas Gillis, of Morrisville, Pennsylvania, switched from PECO in April 2013. Named Plaintiffs Scott and Kimberly McClelland, of Erie, Pennsylvania, switched from Penelec in May 2013. Both the Gillises and the McClellands allege that the door-to-door salesperson who visited them promised that they would save money on their electric bill by switching, and did not disclose that they could, in fact, pay a much higher rate for electricity than they would pay if they remained with their local utility company. (1st Am. Class Action Compl. ¶¶ 8, 10.)

---

[1] When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court must assume the veracity of all well-pleaded facts found in the complaint. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). I assume that all the well-pleaded facts found in the First Amended Class Action Complaint are true.

In making the switch to Defendant's service, the Gillises and McClellands executed an identical form agreement (titled "Sales Agreement"), indicating that Plaintiffs would receive electricity from Defendant at a variable rate. Included in the Sales Agreement was a "Disclosure Statement," which set out a number of terms, including the length of the agreement and the cancellation policy. Only one of the terms of the Disclosure Statement—a term discussing the variable rate that Defendant would charge—is relevant to this dispute. (This term is referred to hereinafter as the "Variable Rate Provision.") The Variable Rate Provision reads, in its entirety, as follows:

> **Variable Rate.** Your price may vary from month to month. This rate is set by [Defendant] and reflects their Generation Charge as reflected in the PJM Day-Ahead Market,[2] Installed capacity (the cost of reserve or standby power), electricity lost on the transmission system ("losses"), estimated state taxes, and any other costs that [Defendant] incurs to deliver your electricity to your electric Utility's Transmission System (where they receive the electricity). For their services, [Defendant] adds a profit margin to the electricity and [Defendant]'s goal each and every month is to deliver your power at a price that is less than what you would have paid had your [sic, read "you"] purchased your power from your local utility company, however, due to market fluctuations and conditions, [Defendant] cannot always guarantee that every month you will see savings. Commodity charges exclude Pennsylvania sales tax if applicable. You may contact [Defendant] for our current Variable Rate.

(1st Am. Class Compl., ¶¶ 8, 10; Id., Exs. A, B.)

Following Plaintiffs' first month of service with Defendant, the variable rate that Defendant charged them for electricity began to exceed the rate that their local utility company was charging. The First Amended Class Action Complaint contains a table comparing the rates that the Gillises paid Defendant for their first nine months of service and the rates that their local utility company, PECO, charged consumers during the same time period.

---

[2] Plaintiffs allege that the "PJM Day-Ahead Market" is "[t]he regional grid on which electricity is traded among energy traders." (1st Am. Class Compl. ¶ 29.)

### The Gillises

| Month | PECO's Rate (in dollars per kilowatt-hour) | Defendant's Rate (in dollars per kilowatt-hour) |
|---|---|---|
| June 2013 | 0.0861 | 0.0825 |
| July 2013 | 0.0861 | 0.1078 |
| August 2013 | 0.0861 | 0.105 |
| September 2013 | 0.0935 | 0.1072 |
| October 2013 | 0.0935 | 0.10999 |
| November 2013 | 0.0935 | 0.12562 |
| December 2013 | 0.0977 | 0.13228 |
| January 2014 | 0.0977 | 0.18983 |
| February 2014 | 0.0977 | 0.3499 |

The First Amended Class Action Complaint contains a similar table comparing the rates that Defendant charged the McClellands to the rates charged by Penelec, the McClellands' local utility company.

### The McClellands

| Month | Penelec's Rate (in dollars per kilowatt-hour) | Defendant's Rate (in dollars per kilowatt-hour) |
|---|---|---|
| June 2013 | [blank in original] | 0.0849 |
| July 2013 | 0.0870 | 0.1043 |
| August 2013 | 0.0870 | 0.1069 |
| September 2013 | 0.0805 | 0.1069 |
| October 2013 | 0.0805 | 0.1099 |
| November 2013 | 0.0805 | 0.1099 |
| December 2013 | 0.0717 | 0.1098 |
| January 2014 | 0.0717 | 0.1299 |
| February 2014 | 0.0717 | 0.1499 |
| March 2014 | 0.0771 | 0.2498 |
| April 2014 | 0.0771 | 0.2699 |

(1st Am. Class Compl., ¶¶ 9, 11.)

As the above tables indicate, the rates that Defendant charged the Gillises and McClellands exceeded the rates then being charged by their local utility providers, PECO and Penelec, in all but their first month of service. For the Gillises, Defendant's rate reached more than triple the local utility company's rate by February 2014. And for the McClellands,

Defendant's rate reached more than triple the local utility company's rate by April 2014. (1st Am. Class Compl., ¶¶ 9, 11.)

### B. *Procedural History*

Plaintiffs brought this putative class action on May 21, 2014, in the Philadelphia Court of Common Pleas. Defendant removed the action to this Court. Thereafter, Plaintiffs filed the currently operative First Amended Class Action Complaint.

Defendant moved to dismiss or, in the alternative, strike Plaintiffs' class allegations. The Honorable Norma L. Shapiro, to whom this action was initially assigned, denied the motion without prejudice and directed Plaintiffs to move for class certification. Following a period of class discovery, Plaintiffs did so on February 2, 2015.

On August 31, 2015, Judge Shapiro denied Plaintiffs' Motion for Class Certification. Plaintiffs took an interlocutory appeal of that decision, and, on February 1, 2017, the United States Court of Appeals for the Third Circuit reversed and remanded, concluding that "the putative class members' individual understandings and interpretations of the of the Variable Rate [P]rovision . . . should not have factored into the class certification analysis." Gillis v. Respond Power, LLC, 677 F. App'x 752, 755 (3d Cir. 2017).

By the time of the remand, this case had been reassigned to my docket. On May 23, 2017, following a status conference to discuss how the case should proceed, I issued an order directing Defendant to respond to the First Amended Class Action Complaint. Defendant did so on June 30, 2017, moving to dismiss Plaintiffs' class claims for failure to state a claim.

Plaintiffs' First Amended Class Action Complaint contains the following four counts: (1) "Declaratory Judgment of Contractual Meaning"; (2) "Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing"; (3) "Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 – 201-9.2"; and (4) Negligent

5

Misrepresentation/Fraudulent Concealment." Based on Plaintiffs' representations that they would only seek class certification of the first two counts—the contract claims—Defendant has moved to dismiss these counts only.

In its Motion to Dismiss, Defendant contends that Plaintiffs' contract claims fail to state a claim, arguing that the meaning of the Variable Rate Provision is unambiguous and forecloses Plaintiffs' reading of that provision as requiring Defendant to charge Plaintiffs a rate no higher than the rate charged by their local utility company. Plaintiffs respond that the meaning of the Variable Rate Provision is ambiguous as to whether Defendant may charge a higher rate than the local utility company, such that the Motion to Dismiss must be denied.

As discussed below, in light of the clear and unambiguous language of the Variable Rate Provision, I conclude that Plaintiffs' contract claims fail. As such, I will grant Defendant's Motion.

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." Id. While it "does not impose a probability requirement at the pleading stage," plausibility does require "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of a claim." Phillips v. Cty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).

To determine the sufficiency of a complaint under Twombly and Iqbal, a court must take the following three steps: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the court should identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted). Courts must construe the allegations in a complaint "in the light most favorable to the plaintiff." Id. at 220.

In evaluating a motion to dismiss, courts generally consider only the allegations contained in the complaint, the exhibits attached thereto, and matters of public record. Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014); Pryor v. Nat'l Collegiate Athletic Ass'n., 288 F.3d 548, 567 (3d Cir. 2002). "[A] complaint may not be dismissed merely because it appears unlikely that [a] plaintiff can prove those facts or will ultimately prevail on the merits." Connelly v. Lane Const. Corp., 809 F.3d 780, 790-91 (3d Cir. 2016) (quoting Phillips, 515 F.3d at 231).

### III. ANALYSIS

Defendant urges me to dismiss Plaintiffs' claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and for a declaratory judgment. As to Plaintiffs' breach of contract claim, Defendant maintains that Plaintiffs' reading of the Variable Rate Provision is implausible and foreclosed by the provision's clear and unambiguous language. As to the implied covenant of good faith and fair dealing, Defendant maintains that the claim is precluded by the language of the Variable Rate Provision. And Defendant contends that Plaintiffs' declaratory judgment claim is derivative of their breach of contract claim, and thus must be dismissed for the same reasons. I agree with Defendant as to each of these arguments.

7

### A. Breach of Contract Based on the Explicit Language of the Variable Rate Provision

To make out a claim for breach of contract under Pennsylvania law, Plaintiffs must show: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." Ocasio v. Prison Health Servs., 979 A.2d 352, 355 (Pa. Super. Ct. 2009). The parties do not dispute that the Disclosure Statement constitutes a contract. However, Plaintiffs and Defendant do dispute whether the Variable Rate Provision imposes a duty upon Defendant to charge Plaintiffs a rate no higher than that charged by the local utility company. Accordingly, I must interpret the Variable Rate Provision to determine whether it imposes such a duty.

The principles guiding a court's interpretation of a contract under Pennsylvania law are well established:

> In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. When construing agreements involving clear and unambiguous terms, [a] [c]ourt need only examine the writing itself to give effect to the parties' understanding. Th[e] [c]ourt must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

Stephan v. Waldron Elec. Heating & Cooling LLC, 100 A.3d 660, 665 (Pa. Super. 2014) (quotation marks omitted). Thus, where the language of the written agreement at issue is clear and unambiguous, the court's analysis ends there. The court only looks to extrinsic evidence where the language of the agreement is "ambiguous"—that is, where the language is "*reasonably* susceptible of different constructions and capable of being understood in more than one sense." Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co., 905 A.2d 462, 468-69 (Pa. 2006) (emphasis

added).[3] As the Pennsylvania Supreme Court has cautioned, "the 'reasonably' qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable." Trizechahn Gateway LLC v. Titus, 976 A.2d 474, 483 (Pa. 2009).

"While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." Ins. Adjustment Bureau, Inc., 905 A.2d at 469. Accordingly, Defendant does not dispute that Plaintiffs' breach of contract claim should be dismissed only if the language of the Variable Rate Provision is unambiguous and forecloses Plaintiffs' interpretation.

With these principles in mind, I turn to the language of the Variable Rate Provision. Once again, that provision reads in its entirety as follows:

> **Variable Rate.** Your price may vary from month to month. This rate is set by [Defendant] and reflects their Generation Charge as reflected in the PJM Day-Ahead Market, Installed capacity (the cost of reserve or standby power), electricity lost on the transmission system ("losses"), estimated state taxes, and any other costs that [Defendant] incurs to deliver your electricity to your electric Utility's Transmission System (where they receive the electricity). For their services, [Defendant] adds a profit margin to the electricity and *[Defendant]'s goal each and every month is to deliver your power at a price that is less than what you would have paid had your [sic, read "you"] purchased your power from your local utility company, however, due to market fluctuations and conditions, [Defendant] cannot always guarantee that every month you will see savings.* Commodity charges exclude Pennsylvania sales tax if applicable. You may contact [Defendant] for our current Variable Rate.

(1st Am. Class Compl., Exs. A, B (italics added.))

In alleging that Defendant breached the Variable Rate Provision, Plaintiffs point to the italicized language above, which provides that Defendant's "goal each and every month" is to charge a rate that is "less" than what Plaintiffs would have paid their local utility company for electricity. Plaintiffs contend that this language—when combined with the subsequent language

---

[3] Additionally, only if such extrinsic evidence fails to resolve the ambiguity does the court consider the interpretative canon that a contract should be construed against the party that drafted it. Burns v. Mfg. Co., Inc. v. Boehm, 356 A.2d 763, 766 n.3 (Pa. 1976).

that Defendant "cannot always guarantee that every month you will see savings"—constitutes a promise that Defendant would, "at worst," charge Plaintiffs "just as much as if [Plaintiffs] had never switched" from their local utility company. (Pls.' Opp'n 13.)

Defendant contends that Plaintiffs' reading of the Variable Rate Provision is implausible, noting: (1) that a "goal" is not a promise; and (2) that the language Plaintiffs rely on "expressly disclaims any guarantee of savings, and never states or intimates that [Defendant's] rates would reflect—let alone be based or dependent upon, in whole or in part—local utility rates." (Def.'s Mem. in Supp. 15.)

I agree with Defendant that the language of the Variable Rate Provision is clear and unambiguous, and that Plaintiffs' reading of the provision is implausible. A statement that Defendant's "*goal*" is to charge Plaintiffs a lower rate than their local utility company cannot reasonably be read as a "*promise"* to do so, or as a promise to do anything else. See Webster's Third International Dictionary, Unabridged (defining "goal" as "the end toward which effort or ambition is directed"), available at http://unabridged.merriam-webster.com (last accessed July 12, 2018); Oxford English Dictionary Online (defining "goal" as "an aim or outcome which a person, group, or organization strives to achieve"), available at http://www.oed.com/ (last accessed July 12, 2018).

In addition to equating a "goal" with a "promise," Plaintiffs' interpretation reads a disclaimer of any "*savings"* over the local utility company's rate as a guarantee that the variable rate charged will, at worst, *equal* the local utility company's rate. But that reading is implausible. A reasonable reader could not read a disclaimer providing that a seller "cannot always guarantee that every month [the buyer] will see savings" over a certain rate as a guarantee that the buyer will never pay more than that rate.

10

Moreover, as Defendant notes, the preceding language of the Variable Rate Provision explicitly lists the factors on which the variable rate is to be based. These factors include Defendant's cost for electricity "as reflected in the PJM Day-Ahead Market," Defendant's other costs, and a profit margin. The fact that this list of factors does not include the rate charged by the local utility company further belies Plaintiffs' reading of the Variable Rate Provision as a promise to charge no more than that rate.

In support of their position that the Variable Rate Provision is ambiguous as to whether Defendant could charge a rate higher than that of the local utility company, Plaintiffs cite to three cases that, like this case, involve a variable rate contract for electricity. (See Pls.' Opp'n 15-16 (citing Silvis v. Ambit Energy, L.P., 674 F. App'x 164 (3d Cir. 2017); Landau v. Viridian Energy PA LLC, 223 F. Supp. 3d 401, 408 (E.D. Pa. 2016); Pls.' Notice of Supplemental Authority 1-2 (citing Hamlen v. Gateway Energy Servs. Corp., No. 16-cv-3526, 2017 WL 6398729 (S.D.N.Y. Dec. 8, 2017.)) However, as discussed below, all three cases are distinguishable: Silvis and Hamlen are distinguishable because the consumers in those cases, unlike Plaintiffs here, alleged that the variable rate was not based on the factors listed in the variable rate agreement. And Landau is distinguishable because the variable rate agreement in that case, unlike the Variable Rate Provision at issue here, included language promising savings over the local utility company's rate.

In Silvis, a variable rate contract provided that an electricity supplier's rate "may vary dependent upon price fluctuations in the energy and capacity markets, plus all applicable taxes." 674 F. App'x at 165. The United States Court of Appeals for the Third Circuit concluded that this language was ambiguous because it was unclear whether the phrase "may vary" gave the electricity supplier complete discretion to set the variable rate, or whether that discretion was

11

limited by the subsequent language "dependent upon price fluctuations in the energy and capacity markets, plus all applicable taxes." Id. at 167-68. Because the court concluded that the term was ambiguous, and because the record at summary judgment in that case "contain[ed] a genuine issue of material fact as to whether [the supplier] breached the contract on the interpretation favoring [the consumer]"—i.e. the interpretation limiting the supplier's discretion—the court reversed the district court's order granting summary judgment for the electricity supplier. Id. at 168.

Similarly, in Hamlen, a variable rate contract provided that the rate would be "set by [the electricity supplier] each month based on [the supplier's] evaluation of a number of factors that affect the total price of electricity." 2017 WL 6398729, at *6. The contract went on to list the "major" factors that would determine the rate. Id. The court held that the complaint stated a breach of contract claim where it alleged that the supplier relied primarily on a factor that was not among those listed "major" factors. Id. at *7.

Unlike the consumers in Silvis and Hamlen, Plaintiffs here do not allege that Defendant breached by failing to base its variable rate on the factors set out in the Variable Rate Provision, such as Defendant's "Generation Charge as reflected in the PJM Day-Ahead Market." Rather, Plaintiffs allege that Defendant breached by charging a higher rate than the local utility company. And as explained above, the clear and unambiguous language of the Variable Rate Provision makes no guarantee that Defendant would refrain from doing so.

Plaintiffs also cite a case that is distinguishable because the contract language at issue *did, in fact,* contain a promise of savings over the local utility company's rate. In Landau, the court noted that a variable rate contract explicitly integrated a "Welcome Letter" that contained "promises that '[y]ou are on your way to enjoying *affordable, green energy*," and that '*from now*

*on*, you'll be doing your part to do something for the environment while *saving money on your energy costs* at the same time." 223 F. Supp. 3d at 409 (emphasis in original). In light of this language, the court held that a consumer stated a breach of contract claim, where he alleged that the rates the supplier charged him "were, on average, roughly 100% higher than [the local utility company's]," noting that while "[it] might not be clear what 'affordable' and 'saving money' mean, . . . no reasonable construction of those terms could mean paying double." Id. at 410.

By contrast, the Variable Rate Provision at issue here expressly disclaims any "guarantee" of "savings" over the local utility company's rate, providing, rather, that savings would be Defendant's "goal."

In sum, Plaintiffs' breach of contract claim rests on a reading of the Variable Rate Provision that is implausible in light of its clear and unambiguous language. That provision sets out the factors on which the variable rate will be based and—while noting that "savings" over the local utility company's rate would be Defendant's "goal"—does not suggest that the rate would be capped at the local utility company's rate. Accordingly, Plaintiffs' breach of contract claim fails to the extent that it is premised on the explicit language of the Variable Rate Provision.

### B. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

In addition to claiming that Defendant breached the explicit language of the Variable Rate Provision, Plaintiffs contend that Defendant breached the implied covenant of good faith and fair dealing.

Under Pennsylvania law, "[e]very contract imposes a duty of good faith and fair dealing on the parties in the performance and enforcement of the contract." J.J. DeLuca Co., Inc. v. Toll Naval Assocs., 56 A.3d 402, 412 (Pa. Super. Ct. 2012) (quoting Giant Food Stores, LLC v. THF Silver Spring Dev., L.P., 959 A.2d 438, 447-448 (Pa. Super. 2008)). While "[t]here is no one-

size-fits-all definition of good faith," Kantor v. Hiko Energy, LLC, 100 F. Supp. 3d 421, 130 (E.D. Pa. 2015), the covenant generally requires that the parties "bring about a condition or . . . exercise discretion in a reasonable way." USX Corp. v. Prime Leasing, Inc., 988 F.2d 433, 438 (3d Cir. 1993); see also Restatement (Second) of Contracts § 205 cmt. d (explaining that while "[a] complete catalogue of types of bad faith is impossible," recognized forms include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance").

"The function of the covenant is to prohibit a party from taking advantage of gaps in a contract." Curley v. Allstate Ins. Co., 289 F. Supp. 2d 614, 617 (E.D. Pa. 2003) (internal quotation marks omitted). Accordingly, while the covenant may aid a party "in effectuating that to which the parties have agreed," it may not "override . . . agreed-upon expectations and duties." Humphreys v. Budget Rent a Car Sys Inc., No 10-cv-1302, 2014 WL 1608391, at *7 (E.D. Pa. Apr. 22, 2014); Pa. Chiropractic Ass'n v. Independence Blue Cross, No. 2705, 2001 WL 1807781, at *6 (Pa. Ct. Com. Pl. July 16, 2001) ("[T]he implied duty of good faith cannot act to displace the express terms and there can be no implied duty as to any matter specifically covered by the written agreement.").

Plaintiffs allege that Defendant breached the implied covenant of good faith and fair dealing in four ways: (1) by charging a monthly rate in excess of the rate charged by Plaintiffs' local utility company; (2) by "representing that each and every month it would deliver power at a price that is less than what the consumer would have paid had he or she purchased the power from the local utility while stating that it could not always guarantee that every month the consumer will see savings"; (3) by "mis-portraying its variable rate power as a no-risk rate"

14

without disclosing its "hidden contractual interpretation that it could and would charge a rate exponentially higher than the rate charged by the consumer's local utility company"; and (4) by "failing to employ the means of a reasonably prudent energy trader to achieve the goal of rate savings . . . or, at worst, a rate equal to the local utility rate." (1st Am. Class Action Compl. ¶ 86 (alterations and internal quotation marks omitted.))

Defendant maintains that none of these allegations state a claim. As to Plaintiffs' first allegation—regarding the charging of rates in excess of the local utility company's rate—Defendant maintains that an implied duty to set a rate no higher than the local utility company's rate would be inconsistent with the explicit language of the Variable Rate Provision. As to Plaintiffs' second and third allegations—regarding alleged misrepresentations—Defendant submits that the implied covenant of good faith and fair dealing does not apply to "pre-contractual marketing, negotiations, or representations," but, rather, applies only to contract performance. (Def.'s Reply 7). And as to Plaintiffs' fourth allegation—regarding Defendant's alleged failure to employ the means of a reasonably prudent energy trader to achieve savings—Defendant urges that such a duty would be "at odds with the terms of the [Variable Rate Provision], which otherwise explicitly set forth the factors involved in the rate calculus." (Def.'s Mem. in Supp. 20.) I agree with Defendant that each of these four allegations fails to make out a claim.

Plaintiffs' first alleged breach of the implied covenant of good faith and fair dealing relates to the same conduct that Plaintiffs contend violates the explicit terms of the Variable Rate Provision—Defendant's charging of a higher rate than that of the local utility company. However, as set out above, the clear and unambiguous language of that provision sets out the factors on which the variable rate was to be based, and does not list the local utility company's

15

rate among those factors. Accordingly, an implied duty to refrain from charging a higher rate would be inconsistent with the parties' express agreement. See USX Corp., 988 F.2d at 439 (rejecting "a claim for breach of implied covenants that is based on exactly the same acts which are said to be in breach of express covenants"); see also Kalodner v. Genworth Life & Annuity Ins. Co., 262 F. Supp. 3d 218, 226 (E.D. Pa. 2017) (rejecting a claim for breach of the duty of good faith and fair dealing that was "based solely on [a defendant-insurer's] imposition of Cost of Insurance [rate] increases that [the plaintiff-consumer] deem[ed] excessive," where the contract at issue explicitly set out the factors on which the Cost of Insurance rates would be based).

As to Plaintiffs' second and third alleged breaches—based on Defendant's alleged pre-contractual misrepresentations—these allegations do not support a claim for breach of the implied covenant of good faith and fair dealing, as the covenant only applies to the *performance* of the contract, not to pre-contractual representations. See J.J. DeLuca Co., Inc., 56 A.3d at 412 (noting that the covenant applies "in the performance and enforcement of the contract"); see also Pa. Chiropractic Ass'n, 2001 WL 1807781, at *6 ("[C]onduct which pre-dates the formation of the contract may not be the subject of the duty of good faith and fair dealing." (citing Creegar Brick & Bldg. Supply v. Mid-State Bank & Trust Co., 560 A.2d 151, 153 (1989)). Accordingly, while Plaintiffs' allegations that Defendant made pre-contractual misrepresentations may support a claim for fraud, they cannot support a claim for breach of the implied covenant of good faith and fair dealing. See Tuno v. NWC Warranty Co., 552 F. App'x 140, 145 (3d Cir. 2014) (affirming district court's dismissal of a claim for violation of the implied covenant of good faith and fair dealing that was "grounded on allegations that . . . [were] redundant with allegations underlying [the plaintiff's] misrepresentation claim").

Finally, Plaintiffs contend that Defendant was obligated to "employ the means of a reasonably prudent energy trader to achieve the goal of rate savings when compared to the local utility rate." (1st Am. Class Action Compl. ¶ 86.) In support of this claim, Plaintiffs allege that a reasonably prudent energy trader would have "utilize[d] hedges, forward contracts, options and other market mechanisms to guard against spot-market spikes and other anomalies that would cause the variable rate to exceed that charged by the consumer's local utility company." (Id. ¶ 40.) Instead, Plaintiffs allege, Defendant "utilized its critical mass of 50,000 Pennsylvania consumers as a captive option on which it could off-load electricity." (Id. ¶ 42.)

Plaintiffs' claim fails because an implied duty to base the variable rate on the results of investment mechanisms such as hedges or options would be inconsistent with the explicit language of the Variable Rate Provision. That provision sets forth six factors on which the variable rate is to be based:

> This [variable] rate . . . reflects [(1)] [Defendant's] Generation Charge as reflected in the PJM Day-Ahead Market, [(2)] Installed capacity (the cost of reserve or standby power), [(3)] electricity lost on the transmission system ("losses"), [(4)] estimated state taxes, and [(5)] any other costs that [Defendant] incurs to deliver your electricity to your electric Utility's Transmission System (where they receive the electricity). For their services, [Defendant] adds [(6)] a profit margin to the electricity . . . .

None of these six factors suggest that Defendant will "utilize hedges, forward contracts, options and other market mechanisms to guard against spot market spikes and other anomalies." (1st Am. Class Action Compl. ¶ 40.) Rather, the first factor requires that the variable rate "reflect[]" the price of energy on the "PJM Day-Ahead Market," which Plaintiffs allege is "[t]he regional grid on which electricity is traded among energy traders." (Id. ¶ 29.) An implied duty to "guard against" variations in that market price by using investment mechanisms such as hedges and options would be inconsistent with the Variable Rate Provision's explicit requirement that the variable rate charged "reflect[]" that market price.

17

And the remaining factors simply provide that Defendant will pass along all costs to consumers through its variable rate, and will add a profit margin. These provisions do not suggest that Defendant must use investment mechanisms such as hedges and options.

The cases cited by Plaintiffs in support of their claims for breach of the implied covenant of good faith and fair dealing do not support their position. (See Pls.' Opp'n 18 (citing Humphreys, 2014 WL 1608391, at *7-9; Kantor, 100 F. Supp. 3d 429.)) In Humpreys, the plaintiff was a consumer who rented a car from the defendant, a rental car company. 2014 WL 1608391, at *1. The consumer alleged that the rental car company breached the implied covenant of good faith and fair dealing by failing to notify the consumer that the rental car had been damaged until six months after the fact, resulting in the consumer's insurance company rejecting coverage for failing to make a timely claim. Id. at *8. The court held that, while the rental agreement did not set out a timeframe in which the rental car company was required to provide the consumer notice of damages, a duty to timely notify could be implied, given that the agreement expressly required the consumer to provide the rental car company with insurance information in order to cover any damages. Id. (holding that the rental car company's "failure to notify the plaintiff of damages until six months after the alleged damage [was] unreasonable and would frustrate the parties' intent to have the damage covered by the plaintiff's insurance").

In contrast to the agreement in Humphreys—which did not include a provision concerning the timeframe in which the rental car company was required to provide the consumer notice of damages—the agreement at issue here does include a provision specifying the factors on which the variable rate would be based. Thus, an implied duty prohibiting Defendant from charging a rate higher than that of the local utility company, or requiring Defendant to use hedges or other investment mechanisms to "guard against . . . spikes" in the rate, is not necessary

to prevent Defendant from frustrating the parties' intent. Rather, the parties' intent as to how the variable rate would be calculated is explicitly set out in the Variable Rate Provision.

Nor does Kantor support Plaintiffs' position. In Kantor, as here, a consumer claimed that the defendant, an energy supplier, breached the implied covenant of good faith and fair dealing in setting its variable rate for electricity. 100 F. Supp. 3d at 429-430. However, in Kantor, the variable rate agreement provided that the rate would "reflect . . . market-related factors," and the plaintiff alleged that the defendant failed to base its variable rate on such factors. Id. at 430. Accordingly, in denying the defendant's motion to dismiss, the court noted that the plaintiff "[was] not attempting to vary the terms of the contract" or "trying to defeat the express contractual terms," but rather was "rel[ying] upon the terms of the contract to explain what duties [the defendant] had agreed to undertake." Id.

Here, by contrast, Plaintiffs cannot plausibly rely upon the terms of the Variable Rate Provision to support their contention that Defendant has breached an implied duty. As noted above, the Variable Rate Provision sets out the factors upon which the variable rate would be based, and Plaintiffs have not alleged that Defendant failed to base its rate on those factors.

In sum, "courts should not write a better contract for the parties than the one they themselves negotiated and executed." ConiMortgage Corp. v. Mortg. Am., Inc., 47 F. Supp. 2d 575, 577 n.1 (E.D. Pa. 1999). Plaintiffs maintain that Defendant's variable rate agreement was a poor deal for consumers. But even if true, that does not permit a court—under the guise of applying the implied covenant of good faith and fair dealing—to rewrite that agreement. And while Plaintiffs maintain that Defendant misled them with an aggressive marketing campaign, in which Defendant portrayed the variable rate agreement as a no-risk deal that guaranteed savings, those allegations are relevant only to Plaintiffs' misrepresentation claims, not to their claims for

breach of the implied covenant of good faith and fair dealing. Accordingly, I conclude that Plaintiffs' breach of contract claim fails to the extent that it alleges a breach of the implied covenant of good faith and fair dealing.

### C. Declaratory Judgment Claim

Finally, Plaintiffs' declaratory judgment claim seeks a judicial declaration that their interpretation of the variable rate agreement is correct. But as discussed above, Plaintiffs' interpretation is foreclosed by the clear and unambiguous language of the Variable Rate Provision. Accordingly, Plaintiffs' declaratory judgment claim fails to state a claim.

## IV. CONCLUSION

For the reasons set out above, Defendant's Motion to Dismiss will be granted and Plaintiffs' class claims for a declaratory judgment and for breach of contract and the implied covenant of good faith and fair dealing will be dismissed. In light of the dismissal of the class claims, Plaintiffs will be directed to notify the court whether they wish to proceed with their remaining individual claims.

An appropriate Order follows.